CLERKS OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED

10/14/2020

JULIA C. DUDLEY, CLERK
BY:   s/ CARMEN AMOS
DEPUTY CLERK

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF VIRGINIA
### LYNCHBURG DIVISION

| | |
|---|---|
| JOHN DOE,<br><br>*Plaintiff*,<br><br>v.<br><br><br>BOARD OF VISITORS OF VIRGINIA MILITARY INSTITUTE, *et al.*,<br><br>*Defendants*. | CASE NO. 6:20-cv-70058<br><br><br>**MEMORANDUM OPINION**<br><br><br>JUDGE NORMAN K. MOON |

This matter is before the Court on ten motions to dismiss Plaintiff John Doe's Amended Complaint for either failure to state a claim under Rule 12(b)(6) or lack of subject-matter jurisdiction under Rule 12(b)(1). Dkt. 10, 20, 22, 48, 50, 52, 54, 59, 60, 71. Plaintiff, a former Virginia Military Institute ("VMI") student, filed suit against the Board of Visitors of VMI, school officials, and individual students alleging that he was subject to a hazing incident to which the school failed to adequately respond. Plaintiff seeks to hold VMI and its officials liable under Title IX and 42 U.S.C. § 1983 for Equal Protection Clause violations. He also seeks damages from the individual students for assault, battery, kidnapping, hazing, and intentional infliction of emotional distress under Virginia law.

Because Plaintiff lacks standing to request injunctive relief as requested under Counts I–IV, the Court will grant Defendants' motions to dismiss these claims insofar as they relate to Plaintiff's request for an equitable remedy. Counts I and II will also be dismissed as to Plaintiff's claim for damages because Plaintiff fails to sufficiently plead the necessary elements of a Title IX claim. The Court grants Defendants' motion to dismiss Count III and IV because Plaintiff fails to

adequately plead a pattern of discrimination as required by actions brought under Section 1983. Consequently, since all the federal claims in this case are dismissed, the Court exercises its discretion to dismiss the remaining state law claims under Counts V–X.

## I.     Background

This action arises out of an alleged hazing incident at VMI and the response of school officials to said incident. For the purposes of ruling on Defendants' motions to dismiss, the following allegations will be taken as true.

Established in 1839 in Lexington, Virginia, VMI aspires "to be the premier small college in the Nation, unequaled in producing educated and honorable citizen-leaders, with an international reputation for academic excellence supported by a unique commitment to character development, self-discipline and physical challenge, conducted in a military environment." Dkt. 5 ¶¶ 24, 28. To this end, VMI uses an adversarial training model emphasizing physical hardship, mental stress, lack of privacy, and exacting regulation of behavior. The goal of this system is to mold character and produce citizen-leaders. *Id.* ¶ 29.

VMI organizes its student body as a military Corps, called the Corps of Cadets. *Id.* ¶ 26. First-year cadets are known as "Rats," and they are made to endure seven months of "harsh and demeaning treatment by upperclassmen in a boot camp–like initiation program." This so-called "Rat Line" is executed under the "military direction and discipline of the Superintendent and Commandant of Cadets." *Id.* ¶ 30. During the spring semester of their first year, first-year cadets finish the Rat Line and become fourth-class cadets, who are granted more privileges. Their daily routines remain controlled by the "cadet-cadre under the military direction and discipline of the Superintendent and Commandant of Cadets." *Id.* ¶ 31.

VMI is governed by a Board of Visitors ("BOV"), with members appointed by the Governor of the Commonwealth of Virginia. *Id.* ¶ 25. The BOV in turn appoints the Superintendent, who acts as VMI's chief executive officer and possesses final policymaking authority for VMI, including the authority to issue General Orders binding on faculty and students. *Id.* At the recommendation of the Superintendent, the BOV also appoints the Commandant of Cadets, who is charged with the "organization, discipline, administration, and basic military instruction of the Corps of Cadets, under the direction of the Superintendent." *Id.* ¶ 27.

Doe alleges that "[s]tudents and graduates of VMI realize unique benefits and opportunities that are not available at other colleges within the state-supported system of higher education in the Commonwealth of Virginia." *Id.* ¶ 32. Doe alleges that "VMI has notably succeeded in its goal to produce citizen-leaders; among its alumni are military generals, political leaders (including the current Governor of the Commonwealth of Virginia), and business executives." *Id.* VMI boasts one of the nation's largest per-student endowments for undergraduate institutions.

a. *VMI's history with race and gender*

Doe alleges that "VMI's long and illustrious history is marred by an ugly history of both race and gender-based discrimination. At the core of this ugly history is VMI's proverbial Golden Rule, which, to this day, has the dogmatic support of many within the VMI community: that its adversative training model is infallible, and any changes that remotely alter or weaken these training methods must be fought at all costs." Dkt. 5 ¶ 34.

In the Complaint, Plaintiff further alleges that the BOV seriously considered the viability of privatization, which would enable VMI to remain all-male, but require that it forego millions of dollars in state and federal aid. *Id.* ¶ 38. This financially unsound option had support from a substantial segment of the VMI community that demanded the preservation of the adversative

method, which could only be achieved by the private, all-male option. *Id.* ¶ 39. Ultimately, the BOV rejected this option by a 9-8 vote. *Id.* ¶ 39.

During the planning process for the integration of women, VMI leaders fought hard to preserve the harshness of the its adversative training model. Nevertheless, over the next decade, VMI's adversative approach, including the Rat Line, underwent changes, most of which were met with resistance from the VMI administration and drew the ire of the VMI community. *Id.* ¶ 43.

By 2008, VMI's inflexible commitment to its adversative approach had manifested in its handling of sexual assault and sexual harassment allegations, prompting the U.S. Department of Education's Office for Civil Rights (the "OCR") to open an investigation into whether sexual harassment at VMI was creating a hostile educational environment that was limiting the educational opportunities at the school. *Id.* ¶ 46.

On May 9, 2014, the OCR released a Letter of Findings after a lengthy investigation into numerous allegations of gender-based discrimination by VMI against female cadets and female faculty members. *Id.* ¶ 47. The OCR found VMI in violation of Title IX because it "permits an environment hostile to female cadets both in the barracks and in the classroom." *Id.* ¶ 48. The OCR determined that "VMI failed to respond in a prompt and equitable manner to complaints of sexual harassment and sexual assault of which it had notice and that this failure permitted a sexually hostile environment to exist for cadets that was sufficiently serious as to deny or limit their ability to participate in VMI's program." *Id.* ¶ 49.

As a result of the investigation and findings, VMI agreed to implement a Voluntary Resolution Agreement and committed to take specific steps to address the identified areas of non-compliance. *Id.* ¶ 50. These steps included, among others, revising "its Title IX grievance policies and procedures to provide for prompt and effective responses to alleged sexual harassment" and

providing "training to ensure that all members of the VMI community – including cadets, faculty, administrators and other staff – are trained regularly on issues related to sexual harassment and on the requirements of Title IX." *Id.* ¶ 51.

The results of the OCR investigation and the remedial actions taken by VMI have reduced the number of sexual harassment and hazing incidents involving female cadets. However, Plaintiff alleges that the results of the OCR investigation and the remedial actions taken by VMI have also served to reinforce long-held institutional gender stereotypes about women, thereby further contributing to a system where, in practice, male cadets are treated differently than female cadets based solely on their gender. *Id.* ¶ 53.

b.  *The hazing incident*

In January 2018, Plaintiff John Doe was a first-year cadet at VMI. On January 30, 2018, Defendants McCausland and Carver formed an agreement to subject Doe and John Doe 2, another first-year cadet, to what McCausland would later describe as "a Rat Mission." *Id.* ¶ 55. Using his authority as a "senior member of the cadet-cadre," McCausland directed another cadet, non-party Joseph Hammer, to steal Doe 2's mattress and bring it to Carver's barracks room in order to force Doe 2 to come retrieve it. *Id.* ¶ 56. At approximately 11 p.m., after taking the mattress as directed, Hammer informed Doe 2 that his mattress (or "hay" in the parlance of VMI cadets) was in Carver's barracks room. Hammer told Doe 2 that McCausland ordered Doe 2 to retrieve the mattress as part of a "Rat Mission." *Id.* ¶ 57.

As ordered, Doe 2 entered Carver's barracks room. Doe 2 was immediately assaulted and "physically subdued" by Carver, before Carver ordered Doe 2 to leave the barracks room without his mattress. *Id.* ¶ 58. Carver then learned that Doe 2 would be returning with Doe. *Id.* ¶ 60. Carver summoned Defendants McCausland, Bennett, Hoopes, and Hamilton (the "Defendant Cadets") to

his room, where they conspired to haze and assault Doe and Doe 2 upon their return to Carver's room. *Id*. ¶¶ 59–60.

On January 31, between midnight and 1:00 a.m., Doe 2 returned to Carver's room with Doe, who waited in the hallway outside the room as Doe 2 entered. *Id*. ¶¶ 61–62. The Defendant Cadets had blacked out the room and were lying in wait. *Id.* Immediately upon Doe 2's entry, Carver physically assaulted Doe 2 and wrestled him into submission. *Id*. ¶ 63. Carver and Bennett bound Doe 2's feet with duct tape. *Id*. ¶ 63.

Carver then stepped outside of the room, saw Doe in the hallway and, using his authority as a senior cadet, ordered Doe to enter his room. *Id*. ¶ 64. Doe complied. *Id*. ¶¶ 64–65. As soon as Doe entered the room, he was physically assaulted by Carver "who, *inter alia*, grabbed him and placed him in a headlock while [Bennett] bound his upper body with a strap and bound his feet with duct tape so, like [Doe 2], he could not escape." *Id*. ¶ 65. Carver and Bennett then placed Doe under a bed near them. *Id*. This assault caused Doe both physical and emotional injury. *Id*.

With Doe and Doe 2 restrained, Carver played the "Adhan," the Islamic call to prayer and referred to in a later incident report as "ISIS music." *Id*. ¶ 66. This was allegedly an attempt to "simulate conditions in Afghanistan and to intimidate [Doe and Doe 2] who were told they were the Defendant Cadets' 'prisoners.'" *Id*. ¶ 66.

Carver and Bennett then took Doe 2 to the "front of the room" and ordered him to lay down on his back. *Id*. ¶ 67. Carver placed a towel over Doe 2's face and poured water over the towel until Doe 2 started to cough. *Id*. This is also known as "waterboarding," a "torture technique" used to interrogate detainees at both Guantanamo Bay, Cuba, and the Abu Ghraib prison in Iraq. *Id*. ¶ 68. Waterboarding allegedly results in the sensation of drowning and has been classified by many as torture. *Id.*

After waterboarding Doe 2, Doe was taken to the front of the room and ordered to lay down on his back. *Id*. ¶ 69. Carver placed a towel over Doe's face, and Bennett pushed the towel partially into Doe's mouth before Bennett and Carver poured two cups of water over his mouth, causing him to gasp for air. *Id.* This caused Doe physical and emotional injury. *Id.* McCausland, Hoopes, and Hamilton made no attempt to intervene while Bennett and Carver waterboarded Doe and Doe 2. *Id*. ¶ 70.

Next, Carver ordered Doe and Doe 2 to "get in their cave" in the leg hole of a desk, where Carver sprayed them with Febreze air freshener. *Id*. ¶ 71. The Defendant Cadets asked Doe and Doe 2 who would win in a "naked" wrestling match. *Id*. ¶ 72. The two were then summoned from under the desk and freed from their restraints so they could wrestle for their freedom in front of their assailants. *Id*. The winner would purportedly be allowed to leave. *Id*.

Bennett then told Doe to remove his pants and Doe 2 to remove his shirt. *Id*. ¶ 73. Doe protested, stating that he wasn't wearing anything under his pants. *Id*. Bennett then directed both Doe and Doe 2 to remove their shirts before ordering them to begin wrestling. The two wrestled for an unstated period until another cadet in the room complained that the wrestling was too loud. *Id*. ¶ 74. Doe suffered both physical and emotional injury from this "orchestrated assault." *Id*.

With the wrestling concluded, Bennett told Doe that he won the match and was free to leave. *Id*. ¶ 75. Fearing for Doe 2's safety, Doe replied he would not leave without Doe 2. *Id*. Bennett then ordered Doe and Doe 2—still shirtless—to stand back-to-back before duct taping them together. *Id*. ¶ 76. Once they were bound together, they were told they could leave Carver's barracks room. *Id*.

c.   *Aftermath of the incident*

Later on that day, Doe reported the incident to an unnamed upper-class cadet, who in turn reported the incident through the chain of command to Lieutenant Colonel Kevin Faust, the Assistant Title IX Coordinator. *Id.* ¶ 77. Faust's immediate supervisor is Defendant William J. Wanovich. On February 2, 2018, two days after the report by Doe to an upper-classman, Faust notified VMI police officer L.E. Hunt "of a hazing incident that occurred in Barracks on 1/30/18." *Id.* ¶ 78. The cause for the delay in Faust's reporting of the incident is unknown. *Id.*

On or about February 2, 2018, Hunt initiated a law enforcement investigation and interviewed each cadet involved. *Id.* ¶ 81. McCausland admitted to Hunt that "the incident was all part of a Rat Mission, a VMI tradition." *Id.* Doe alleges that "McCausland's admission establishes that these types of assaults are routine and commonplace at VMI." *Id.* In interviewing Carver and McCausland, Hunt learned that the two cadets had taken pictures of the assault with their cell phones. *Id.* ¶ 82. Hunt then directed that Carver and McCausland delete the photos from their phone in her presence. *Id.*

VMI did not conduct an independent Title IX investigation into Doe's allegations. *Id.* ¶ 83. Doe alleges this was a violation of the 2014 OCR Voluntary Resolution Agreement requiring VMI to conduct an independent Title IX investigation into allegations of sexual misconduct. *Id.* VMI also failed to "take immediate steps to eliminate the hostile environment it created or to protect John Doe during the pendency of any Title IX investigation, to include the resolution of his complaint, as it is required to do by law." *Id.* ¶ 84. Doe alleges that "VMI's failure to respond to the allegations of sexual misconduct subjected [Doe] to a hostile environment, the effects of which VMI failed to appropriately remedy." *Id.* ¶ 86.

As a result of Hunt's investigation, VMI initiated disciplinary proceedings against McCausland, Carver and Bennett. *Id*. ¶ 87. Their disciplinary hearing was scheduled for March 14, 2018. *Id*. On or about March 11, 2018, William T. Woodrow, III, an attorney representing McCausland in the disciplinary proceeding, contacted Doe regarding the disciplinary proceeding. *Id*. ¶ 88. Woodrow attempted to have Doe prepare a declaration that minimized the incident. *Id*. In fact, Woodrow sent Doe a draft template along with instructions on what should be said. *Id*. Doe alleges that in an email dated March 11, 2018, Woodrow stated to Doe: "Once you fill a draft in, send it to me so I can clean it up if needed and I will send it back to you for signing." *Id*. ¶ 89. When Doe refused, Woodrow attempted to minimize the incident and stated that VMI was overreacting by attempting to punish McCausland. *Id*. Woodrow further informed Doe that "VMI provided us with their witness list and both you and Cadet Bennett (whose parents also don't want him to be involved) are on it. So the committee will very likely be calling you to testify, and that is out of our hands." *Id*. ¶ 90.

On March 13, 2018, Doe received an email from Faust ordering him to attend the disciplinary hearing the following day because he was going to be called as a witness. *Id*. ¶ 91. Doe responded to Faust asking for more specific instructions. *Id*. ¶ 92. As a victim, Doe states that he was unsure what his rights were or what to expect at the hearing. *Id*. For example, he was not told whether lawyers would be present, or whether he could obtain counsel of his own. *Id*. Faust did not reply to Doe's email. *Id*.

On or about March 14, 2018, Doe appeared at McCausland's disciplinary hearing, where he was directed to wait in the same waiting room as his assailants. *Id*. ¶ 93. As ordered by VMI, Doe testified at McCausland's hearing "against his free will and without the assistance or advice of counsel." *Id*. ¶ 94.

As a result of this entire episode, including VMI's "unlawful and inadequate response," Doe was subjected to a hostile environment, which included shunning from other cadets, and was deprived of his "sense of security and person," forcing him to withdraw from VMI. *Id*. ¶ 95.

## II.      Procedural History

Doe initiated this action in federal court on January 28, 2020, Dkt. 1, filing an amended complaint shortly after to correctly identify Defendant Alec G. Hoopes, Dkt. 5. The case was originally before Judge Glen E. Conrad, also of the Western District of Virginia, until he transferred the case to this Court in response to Defendants' VMI, Peay, and Wanovich (the "VMI Defendants") motion to dismiss, or, in the alternative, to transfer venue. Dkts. 8, 43.

Before the Court are ten motions to dismiss for either failure to state a claim under Rule 12(b)(6) or lack of subject-matter jurisdiction under Rule 12(b)(1). Dkts. 10, 20, 22, 48, 50, 52, 54, 59, 60, 71. The parties collectively argued these motions at a telephonic hearing, and all are now fully briefed and ripe for review.

## III.      Legal Standard

A motion to dismiss pursuant to Rule 12(b)(1) tests a district court's subject matter jurisdiction. Typically, the Court must accept as true all material factual allegations in the complaint and construe the complaint in the plaintiff's favor. *See Warth v. Seldin*, 422 U.S. 490, 501 (1975). But where a defendant challenges the factual basis for subject matter jurisdiction, "the plaintiff bears the burden of proving the truth of such facts by a preponderance of the evidence." *U.S. ex rel. Vuyyuru v. Jadhav*, 555 F.3d 337, 347–48 (4th Cir. 2009). "Unless the jurisdictional facts are intertwined with the facts central to the merits of the dispute," the district court may "go beyond the allegations of the complaint and resolve the jurisdictional facts in dispute by considering evidence outside the pleadings." *Id*. at 348. "The moving party should prevail only if

the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991).

A motion to dismiss pursuant to Rule 12(b)(6) tests the legal sufficiency of a complaint to determine whether a plaintiff has properly stated a claim. The complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), with all allegations in the complaint taken as true and all reasonable inferences drawn in the plaintiff's favor, *King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016). A motion to dismiss "does not, however, resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Id.* at 214.

Although the complaint "does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. A court need not "accept the legal conclusions drawn from the facts" or "accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Simmons v. United Mortg. & Loan Inv., LLC*, 634 F.3d 754, 768 (4th Cir. 2011) (internal quotations omitted). This is not to say Rule 12(b)(6) requires "heightened fact pleading of specifics"; instead, the plaintiff must plead "only enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Still, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

## IV.    Analysis

The motions to dismiss before the Court fall into two categories: First, Defendants VMI, Superintendent J.H. Binford Peay III and Commandant of Cadets William J. Wanovich challenge

Doe's federal claims against him under Title IX and 42 U.S.C. § 1983. They argue that Doe lacks standing to seek injunctive relief as to any of these four claims, and in any event, Doe fails to state a claim for which relief can be granted. The Court agrees with the Defendants on both points and finds their motions to dismiss should be granted.

Second, the Cadet Defendants—Carver, McCausland, Bennett, Hamilton, and Hoopes—challenge Doe's claims against them for assault, battery, false imprisonment, hazing, IIED, and civil conspiracy. These Cadet Defendants first contend that supplemental jurisdiction over these state law claims is improper, because they do not arise out of the same nucleus of operative facts as Doe's federal claims. Alternatively, the Cadet Defendants argue that Doe fails to state a claim as to any of these state causes of action. Ultimately, the Court exercises its discretion in dismissing Plaintiff's state-law claims against the individuals pursuant to its authority under 28 U.S.C. § 1367(c).

a.  *Defendants VMI, Peay and Wanovich*

i.  <u>Standing to seek injunctive relief</u>

Doe seeks prospective relief through Title IX and Section 1983 to cure the alleged gender discrimination faced by male cadets at VMI. With respect to his standing to seek such relief, Doe alleges that he "now continues his military preparation in a Reserve Officer Training Command program at his new School." Dkt. 16 at 18. Doe further states that "[t]hese allegations collectively demonstrate that [Doe] is 'ready and able' to take advantage of the educational opportunities VMI provides but for their discriminatory policy preventing him from doing so on an equal basis." *Id.*

But Doe cannot escape the fact that he voluntarily chose to withdraw as a student at VMI. *See* Dkt. 16-4 (Doe's attachment of email correspondence between him and VMI officials, showing VMI officials attempting to convince Doe to remain at VMI). Doe maintains that he *could*

12

re-enroll at VMI in the future, but such an occurrence is entirely speculative. The Amended Complaint lacks any allegations that he has applied for re-admission to VMI or any factual description regarding his intent to re-apply, which he first raised in briefing. *See* Dkt. 5.

There is no escaping the Supreme Court's requirement that to seek injunctive relief, Doe must make "a showing of [a] real or immediate threat that he will be wronged again. *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983); *see Raub v. Campbell*, 785 F.3d 876, 885–86 (4th Cir. 2015) (quoting *Simmons v. Poe*, 47 F.3d 1370, 1382 (4th Cir. 1995)) ("Where a § 1983 plaintiff also seeks injunctive relief, it will not be granted absent the plaintiff's showing that there is a 'real or immediate threat that [he] will be wronged again . . . in a similar way.'") (alterations in original). Even where a plaintiff could establish that her constitutional rights were violated, "past wrongs do not in themselves amount to that real and immediate threat of injury." *Raub*, 785 F.3d at 886 (internal quotations omitted). Indeed, Article III standing requires that a plaintiff show an invasion of a legally protected interest that is "certainly impending." *Griffin v. Dep't of Labor Fed. Credit Union*, 912 F.3d 649, 655 (4th Cir. 2019); *see also Doe v. Rector & Visitors of Univ. of Va.*, No. 3:19-CV-00070, 2020 WL 5096948, at *4 (W.D. Va. Aug. 28, 2020). Plaintiff in this case falters in the wake of the standing requirements for injunctive relief. In this case, Plaintiff's allegation of any likelihood of future harm are, at best, speculative, and are neither imminent nor concrete. Even accepting the contention that there is a possibility of reenrollment by Doe at VMI, Doe still cannot overcome the imminent harm hurdle that Article III requires.

It bears mentioning that other circuits have provided for a more relaxed standing threshold in the Title IX context. In the Fifth Circuit, for example, courts have allowed Title IX claims for prospective relief where the plaintiff merely demonstrates "that he is ready and able to compete, but the discriminatory policy prevents him from doing so on an equal basis." *Gruver v. Louisiana*

*through Bd. of Supervisors of La. State Univ. & Agric. & Mech. Coll.*, 401 F. Supp. 3d 742, 755

(M.D. La. 2019). Even so, Plaintiff has cited no Fourth Circuit cases applying this standard. Absent

some ruling by the Fourth Circuit, such an approach seems to be in clear contravention of *Lyons*,

and so the Court declines to take such a step here.

As a result, the Court will dismiss Counts I – IV of Doe's Amended Complaint insofar as

they seek prospective relief against VMI, as well as against Peay and Wanovich in their official

capacities. Standing presents no issue for Plaintiff's damages claims under Title IX and Section

1983. However, as discussed further in the subsequent sections, Plaintiff's damages claims still

must be dismissed.

ii.   Title IX gender discrimination

Plaintiff alleges that through a "cycle of abuse and deliberate indifference to the abuse,

VMI has created a discriminatory hostile educational environment in which hazing of male cadets

is pervasive and harmful, and in which reporting of such hazing is discouraged at an individual

and institutional level." Dkt. 5 ¶ 106. Doe claims that had he "been a female, he would not have

suffered this harm in the first place—because VMI's strict enforcement deters such behavior

against female cadets—or, at a minimum, VMI would have strictly enforced its anti-hazing policy

and taken meaningful corrective action." *Id*. ¶ 109. As a result, "VMI's differential treatment of

female and male cadets constitutes a policy and practice of intentional discrimination against

cadets on the basis of sex in violation of Title IX." *Id*. ¶ 110. Simply put, Doe alleges that VMI

has put into place policies and practices that "make it far less likely a female cadet will be subject

to harassment, sexual harassment, and/or sexual misconduct at the hands of their fellow cadets."

Dkt. 16 at 21. Accordingly, VMI's "policies and practices make first-year male cadets more

vulnerable to being denied opportunities and benefits of a VMI education, as [Doe] was in this case." *Id.*

Title IX of the Educational Amendments of 1972 (20 U.S.C. § 1681 *et seq.*) provides, in relevant part, that "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The Supreme Court has concluded that a victim of sex discrimination is entitled to pursue a private cause of action against a federally-funded educational institution for a violation of Title IX. *See Cannon v. Univ. of Chi.*, 441 U.S. 677, 709 (1979).

Doe advances two theories of gender discrimination under Title IX. Dkt. 16 at 20–21. First, Doe argues that VMI maintained "policies of discrimination" that are "overt" or "institutional." Dkt. 16 at 21. Second, Doe argues that the operative facts show that VMI had actual notice of discrimination and acted with deliberate indifference to eliminate it. *Id.*

### 1.   **Overt policies of discrimination**

Doe alleges that "VMI has instituted numerous well-documented changes to incorporate female cadets into their adversative educational model." Dkt. 16 at 23 (citing Dkt. 16-1). "As a result, a female cadet within this system is far less vulnerable to the abuses male cadets face at the hands of upper-class cadets who are responsible for their training." *Id.* Doe contends that VMI's "Dyke System," through which VMI charges upperclassmen with the training and discipline of first-year cadets, known as "Rats," exacts abuse against male cadets to a significantly higher degree than female cadets. *Id.*

Under the Fourth Circuit's framework, "[t]o allege a violation of Title IX, [a plaintiff] must allege (1) that he was excluded from participation in an education program because of his sex; (2)

that the educational institution was receiving federal financial assistance at the time of his exclusion; and (3) that the improper discrimination caused the student harm. *Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586, 616 (4th Cir. 2020), *as amended* (Aug. 28, 2020).

Therefore, under Plaintiff's theory, if VMI imposes its adversarial method more harshly upon male cadets than it does female cadets, to the degree that male cadets are denied educational opportunities at VMI that females are afforded, then VMI has violated Title IX by excluding its male cadets from participation in an educational program because of their sex. Indeed, courts have held that even where a policy is facially neutral in its treatment of men and women, the institution may still violate Title IX where the policies are discriminatory *as applied*. *See Hayden ex rel. A.H. v. Greensburg Cmty. Sch. Corp.*, 743 F.3d 569, 583 (7th Cir. 2014) ("The hair-length policy is applied only to the boys team, with no evidence concerning the content of any comparable grooming standards applied to the girls team."). To prevail on his claim, Doe must sufficiently allege that he was both harmed and the harm was a result of an unlawfully discriminatory policy or practice existing at VMI.

Doe attempts to show a policy or practice discriminating against men on the basis of sex exists at the school. For support, he alleges that the changes to VMI's policies incorporating female cadets into the adversarial method have resulted in a system in which female cadets are far less vulnerable to abuse than their male counterparts. Dkt. 16 at 23 (citing Dkt. 16-1). He continues by alleging that VMI's first-line disciplinary board for hazing offenses rarely categorize the hazing of male cadets as "discrimination," and thus instances of hazing directed toward female cadets often receive more formalized disciplinary proceedings than hazing directed toward male cadets. *Id.* at 24–25. Lastly, Doe's Amended Complaint points to "[k]nown examples of the harmful

implementation of the adversative method that male cadets are forced to endure, while female cadets are not, include, *inter alia*:

a. A male cadet was tied to a chair and beaten by upper-class cadets with socks that contained bars of soap;

b. A male cadet was ordered to defecate in another cadet's container of protein supplement;

c. Male cadets were ordered to workout [sic] in upper-class cadet's [sic] barracks rooms, while chewing tobacco or with a full mouth of water, with the intended purpose that the male cadets would only be able to breathe through their mouths; and

d. During a training session, a male cadet was ordered to stay on the pullup bar, despite his complaints that he was about to vomit, resulting in him vomiting on himself."

Dkt. 5 ¶ 107.

The allegations made by Doe do not rise to the level of a policy or practice that is legally cognizable as discriminatory. As VMI Defendants point out, Doe does not sufficiently assert examples of hazing incidents which male cadets were forced to endure. Instead, he primarily relies on the disturbing events he endured and tries to extrapolate from those that a "school-wide policy" of similar treatment exists. The other examples set forth by Doe, listed above, are devoid of key factual content. The Amended Complaint includes no allegations about who was involved in such incidents, when they occurred, or even whether there was subsequent action taken by the VMI Defendants. Even if the allegations did rise to the appropriate pleading standard, Doe's claim fails in other respects.

For instance, VMI's Dyke System contains no overt policies of discrimination, in that nothing expressly calls for differing treatment between male and female cadets. This is not necessarily fatal to Doe's case, as courts have found facially neutral policies discriminatory where

they are discriminatory *as applied*. *See Hayden ex rel. A.H.*, 743 F.3d at 583. But Doe must nevertheless allege sufficiently that these neutral hazing policies are indeed applied in a discriminatory manner, and he fails to do so.

Further, even if VMI could be said to have a policy or practice of condoning the hazing of male cadets, under the facts presented by Doe, taken as true at this stage of the case, his allegations do not show that he was a victim of such a policy or practice. Although the investigation into the hazing incident was not without issues, the school did promptly investigate what occurred, and the perpetrators of the incident received one-year suspensions for their role in the incident. For the reasons discussed, the Court finds that the Plaintiff failed to identify any plausible practice or policy of VMI encouraging or condoning the hazing of male cadets.

2.  **Deliberate indifference**

Doe's stronger argument is that the VMI Defendants were deliberately indifferent to the gender discrimination occurring at the school. Doe argues that even if the VMI Defendants did not maintain an official policy or practice of discriminating against male cadets, then VMI at least had "actual knowledge" of these hazing incidents and displayed deliberate indifference to fixing these problems. Dkt. 16 at 25.

Title IX gender discrimination claims under the "deliberate indifference" theory largely track claims under the "official policy" theory. *J.H. v. Sch. Town of Munster*, 160 F. Supp. 3d 1079, 1091 (N.D. Ind. 2016) ("[T]he same evidence supporting that the custom or practice exists, identified at length above, also supports deliberate indifference since the custom or practice *was* deliberate indifference"). Under both, a plaintiff must prove that the university had the intention of discriminating against a protected class. While this is proved under the "official policy" theory by showing an official school policy based on traditional notions of gender roles,

intent is shown in the "deliberate indifference" theory by demonstrating that the university had actual knowledge of the discrimination yet was deliberately indifferent to it. *Id.* ("[T]he policy alone suffices to establish an intent to discriminate."). Indeed, courts analyzing Title IX claims under the deliberate indifference theory use the same framework set out by the Supreme Court in *Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.* 526 U.S. 629 (1999); s*ee Hayden ex rel. A.H.*, 743 F.3d at 583; *Gruver*, 401 F. Supp. 3d at 756; *J.H. v. Sch. Town of Munster*, 160 F. Supp. 3d 1086. Namely, Doe must demonstrate: (1) the school acted with deliberate indifference to gender discrimination of which it had (2) actual knowledge, and (3) the discrimination must be so severe, pervasive, and objectively offensive that it can be said to deprive the victim of access to the educational opportunities or benefits provided by the school. *Davis*, 526 U.S. at 650.

The parties' briefs principally address several cases arising in other circuits.  Courts elsewhere have found schools liable under this theory where facially neutral policies were applied in a discriminatory manner against one gender or sex. For example, *Gruver v. Louisiana*, the parents of a deceased student alleged that while the university had a formal policy prohibiting hazing by both male fraternities and female sororities, the university in practice turned a blind eye to the hazing of male students. 401 F. Supp. 3d at 745. The Court found that the deceased student's parents successfully stated a claim against Louisiana State University by showing that 1) LSU had actual notice of numerous hazing violations, 2) failed to address these hazing issues in male fraternities while aggressively and appropriately correcting the issue in female sororities, and 3) that this failure increased the risk of death to the deceased student. *Id.* at 762.

Similarly, in *J.H. v. School Town of Munster*, a male high school student alleged that while hazing was facially banned against both male and female swim team members at his school, male hazing was rampant, and the school turned a blind eye to it. 160 F. Supp. 3d at 1082. Because the

policy identified by J.H. was that the school "engaged in a practice or custom of deliberate indifference such that the school purposefully ignored complaints of hazing in the boys program based on gender . . . the same evidence supporting that the custom or practice exists, identified at length above, also supports deliberate indifference since the custom or practice *was* deliberate indifference." *Id.* at 1091.

In sum, the well-pleaded allegations in the Amended Complaint, taken as true, must establish that VMI engaged in a policy or practice of ignoring or condoning hazing of male cadets disproportionately to female cadets—either intentionally or with deliberate indifference to the rights of these male cadets—merely because it was the hazing of male cadets and not female cadets. This can be shown by treatment of Doe himself, in addition to other VMI cadets. Doe fails to make the proper showing, and compared to the cases of *J.H.* and *Gruber*, he does little to convey this disparate treatment. In the case of *J.H.*, the plaintiff alleged numerous instances where hazing was ignored or minimized at different times and locations. *J.H.*, 160 F. Supp. 3d at 1087. The complaint in that case also alleged that there were repeated requests by a parent that the school implement additional safeguards to hazing. *Id.* Each of the requests went to a different administrator, from the coach to the athletic director to the principal and, finally, to the superintendent. *Id.* School officials minimized the acts as "pranks," "horse play," and "tradition." *Id.* The court in *J.H.* did note that "it is difficult to prove a negative" and that an inference of disparate treatment is appropriate without a showing that female hazing was occurring, but being prosecuted. *Id.* In the case of VMI, Plaintiff himself acknowledges that the OCR investigation in 2014 reduced hazing incidents involving female cadets, but it did not eliminate them. Dkt. 5 ¶ 53. Doe attempts to contrast more aggressive measures against female hazing with far less aggressive steps taken against male hazing. Unfortunately, by making such a distinction and relying on his

own experiences, Doe proves the opposite. First, the allegations in the Amended Complaint do not establish that female cadets are treated differently than male cadets upon reporting a hazing incident involving sexual conduct prohibited by Title IX. Rather, Doe merely states in a conclusory fashion that there is a strict enforcement policy in existence for female cadet reports—but he fails to actually point to any such policy in action. *Id.* ¶ 100.

Second, far from ignoring or condoning his own experience being hazed, Doe's allegations about VMI's response shows the opposite: VMI investigated and took prompt disciplinary action. Although it was not a Title IX investigation, VMI's actions constituted a reasonable response, carried out in a manner that resulted in disciplinary action against the student-Defendants. Dkt. 11 at 21. Each alleged assailant received a one-year suspension, indicating that VMI took the episode seriously, regardless of whether the cadet was male or female.

Moreover, Doe is also tasked with identifying instances of actual knowledge by the VMI Defendants. He attempts to do so by suggesting that the VMI administration was aware of hazing since the 2014 OCR investigation. Dkt. 5 ¶¶ 114–16. However, such generic allegations, devoid of factual content, are not sufficient for the purposes of showing actual knowledge. *See Facchetti v. Bridgewater Coll.*, 175 F. Supp. 3d 627, 639–41 (W.D. Va. 2016) (failing to find actual notice where a complaint alleged knowledge of prior sexual acts on campus but not specific assaults by the assailant). Because Doe merely alleges some amorphous knowledge of hazing incidents at the institution, the Court may not find deliberate indifference on the part of the VMI Defendants.

iii.   Title IX student-on-student sexual harassment

The Fourth Circuit recently addressed the framework for Title IX claims of student-on-student sexual harassment in *Feminist Majority Foundation v. Hurley*, 911 F.3d 674, 685–86 (4th Cir. 2018). Guided by *Davis*, the Court emphasized the flexibility institutions maintain when

disciplining students who sexually harass their classmates. *Id.* at 685. For this reason, the panel held that an institution "is not normally liable for failing to cede to a harassment victim's specific remedial demands," nor may an institution be subjected to Title IX liability when engaging in or refraining from specific forms or disciplinary action. *Id.* Importantly, the Court stated that if "the institution's response—or lack thereof—to known student-on-student sexual harassment is 'clearly unreasonable,' the institution has contravened Title IX." *Id.*

Doe argues that "if two female cadets had been ordered to strip naked and wrestle for their freedom in the presence of numerous male assailants, VMI would have immediately contacted law enforcement, would have processed the complaint in accordance with procedures that met the Title IX requirements, would have conducted a proper Title IX investigation, and would have taken immediate steps to protect the victims during the pendency of the investigation and resolution of the complaint." Dkt. 5 ¶ 85.

Whatever evidentiary route the plaintiff chooses to follow, he or she must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted "*discrimina[tion]* . . . because of . . . sex." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)*.* Namely, "the inquiry requires careful consideration of the social context in which particular behavior occurs and is experienced by his target. A professional football player's working environment is not severely or pervasively abusive, for example, if the coach smacks him on the buttocks as he heads onto the field—even if the same behavior would reasonably be experienced as abusive by the coach's secretary (male or female) back at the office." *Id.* at 81–82.

Here, Doe has not pled that there was any sexual nature to this brief incident of shirtless wrestling between male underclassmen. Surely Doe is correct that if male upperclassmen had

trapped two female cadets in a room and forced them to remove their shirts and wrestle, it would be a different story. But men removing their shirts has far different connotations than men removing their shirts, which is done routinely in public without sexual connotation. Title IX "does not reach genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex." *Id.* at 81. Thus, this brief episode of shirtless wrestling does not rise to the level of sexual harassment sufficient to trigger Title IX.

For the aforementioned reasons, the Court must dismiss the claims for damages against the VMI Defendants under Counts I–III.

#### iv.   Equal Protection Clause violations

Doe also sues the VMI Defendants under 42 U.S.C. § 1983 claiming violation of his rights under the Equal Protection Clause. Dkt. 5 at 26. Counts III and IV mirror Doe's Title IX claims for gender discrimination (Count I) and student-on-student sexual harassment (Count II). First, Doe contends that "VMI has a custom or practice of being deliberately indifferent to the hazing of male cadets." Dkt. 16 at 31. Second, Doe contends that "VMI responded with deliberate indifference to the sexual harassment that Plaintiff endured on January 31, 2018." *Id.*

As a preliminary matter, the VMI Defendants contend that they are immune from suit under Section 1983 in their official capacities. First, VMI argues that "[a]s a state agency, the Board of Visitors of VMI retains the same protections from suit in federal court outlined in the Eleventh Amendment to the United States Constitution that the Commonwealth itself enjoys." Dkt. 11 at 23. State entities and state officials are immune from damages suits in their official capacities. *See Brandon v. Holt*, 469 U.S. 464, 471 (1985); *Harter v. Vernon*, 101 F.3d 334, 337 (4th Cir. 1996) (citing *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989)). Thus, any claim against VMI must fail, as Doe fails to show standing to seek prospective relief against VMI, and VMI is

protected against a suit for compensatory relief by sovereign immunity. The Equal Protection claim against VMI Defendants in their official capacities is therefore dismissed. The same cannot be said to bar Doe's claims against Peay and Wanovich in their individual capacities. *See* Dkt. 5 at 26.

The question then remains whether Doe states a claim against Peay and Wanovich in their individual capacities. The VMI Defendants argue that Doe attempts to impose supervisory liability on Peay and Wanovich, which is clearly disallowed under individual capacity claims under Section 1983, and that Doe must show some constitutional injury at the hands of the party sued in his individual capacity. Dkt. 11 at 26. *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977); *Waybright v. Frederick Cty.*, 528 F.3d 199, 203 (4th Cir. 2008) ("[S]upervisors and municipalities cannot be held liable under § 1983 without some predicate 'constitutional injury at the hands of the individual [state] officer.'"). Indeed, the VMI Defendants point out that Doe fails to plead facts that result in a constitutional injury "at the hands" of Peay and Wanovich. Instead, the Amended Complaint simply states that they "turned a blind eye" to male hazing and responded to complaints with "deliberate indifference." Dkt. 5 ¶¶ 102, 105. Aside from a statement that asserts Peay and Wanovich had mischaracterized Doe's incident as "hazing" instead of sexual harassment and a blanket statement that Peay and Wanovich had "total control" over the male cadets, nothing in the Amended Complaint sufficiently pleads a nexus of the sort necessary to connect the individual actions of Peay and Wanovich with a constitutional violation.

For this reason, Defendants are correct in asserting that even in their individual capacities, Plaintiff fails to state a claim.

As additional grounds for dismissal, the VMI Defendants argue that Peay and Wanovich are entitled to qualified immunity. Dkt. 11 at 26. Qualified immunity is a two-prong inquiry that

considers (1) whether the plaintiff's allegations state a claim that the defendants' conduct violated a constitutional right and (2) whether that right was clearly established. *See Simmons v. Poe*, 47 F.3d 1370, 1385 (4th Cir. 1995). When the conduct of a state official is objectively reasonable under the circumstances, he is entitled to qualified immunity. *See Raub*, 785 F.3d at 881.

In the present case, Plaintiff does not identify any violation of his constitutional rights by Peay and Wanovich. Even if he did, the VMI Defendants response was reasonable under the circumstances. They responded to the report of misconduct by "contacting law enforcement, which immediately investigated the misconduct, and ultimately VMI suspended Bennett, Carver, and McCausland for the misconduct." Dkt. 11 at 28. Consequently, even if this Court had found a Constitutional violation, the VMI Defendants acted reasonably in responding to the hazing incident and would be entitled to qualified immunity.

Ultimately, because Plaintiff fails to sufficiently plead a claim under Section 1983, the Court must dismiss Count IV against the VMI Defendants.

### b. *Student-Defendants*

When district courts have original jurisdiction, they "may decline to exercise supplemental jurisdiction over a claim [] if . . . the district court has dismissed all claims over which it has original jurisdiction[.]" 28 U.S.C. § 1367(c). Courts typically consider factors like convenience and fairness to the parties, existence of underlying issues of federal policy, comity, and judicial economy. *Shanaghan v. Cahill*, 58 F.3d 106, 110 (4th Cir. 1995). "Generally, when the federal claim is dismissed before trial, the balance of factors to be considered in determining whether to exercise supplemental jurisdiction—judicial economy, federal policy, and comity—point toward declining jurisdiction over the remaining state law claims." *Delk v. Moran*, No. 7:16-CV-00554, 2019 WL 653008, at *2 (W.D. Va. Feb. 15, 2019) (citation omitted). The Court finds that for

judicial economy and comity purposes, it will decline to exercise supplemental jurisdiction over any State law claims asserted in the Amended Complaint. Consequently, the Court will dismiss Counts V–X against the student-Defendants without prejudice.

## V.    Conclusion

For the reasons set out above, the Court will grant VMI Defendants' motions to dismiss as to Counts I–IV and will dismiss Counts V–X pursuant to the district court's ability to decline to exercise supplemental jurisdiction.

The Clerk of the Court is directed to send a copy of this Memorandum Opinion, and accompanying order, to all counsel of record.

Entered this 14th day of October, 2020.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE